IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANTHONY JOHNSON            :

                            :

     v.                   :   Civil Action No. DKC 10-2527

                            :

BOBBY SHEARIN, et al.      :

                            :

**MEMORANDUM OPINION**

Petitioner Anthony Johnson, proceeding *pro se*, commenced this action on September 13, 2010, by filing an application for a writ of *habeas corpus* challenging his 2006 state court conviction on charges of first-degree murder and use of a handgun in the commission of a crime of violence. (ECF No. 1). Respondents Bobby Shearin, Warden of the North Branch Correctional Institution, and Douglas F. Gansler, the Attorney General of the State of Maryland, opposed the application (ECF No. 13), and Petitioner filed a reply (ECF No. 15). Having reviewed the parties' submissions, including the transcripts of the underlying proceedings, the court now rules, no hearing being deemed necessary. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*; Local Rule 105.6; *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §

2254(e)(2)).  For the reasons set forth below, the petition will be denied.

## I.   Background

By an indictment filed March 17, 1997, Petitioner Anthony Johnson was charged, *inter alia*, with first-degree murder and use of a handgun in the commission of a crime of violence related to the February 4, 1997, death of Anthony Jackson. Petitioner remained at large until in or around November 2005. Following two motions hearings, the case proceeded to a jury trial in June 2006 in the Circuit Court for Prince George's County, Maryland.

### A.   Trial

The State's principal witness at trial was Yvonne Kelly, a fifty-one-year-old crack cocaine user who was, at that time, incarcerated on drug possession charges.  Kelly testified that, on February 4, 1997, she hosted a gathering of individuals – most of whom were drug dealers – at an apartment in Laurel, Maryland.  A number of people came and went at various points, but among those present for most of the day was fourteen-year-old Mark McRae, Jr., and twenty-year-old Anthony Jackson. Jackson was a drug dealer to whom McRae, Jr., had introduced Kelly approximately one year earlier.  During that time, Kelly and Jackson had established a business relationship whereby Kelly referred drug purchasers to Jackson in exchange for crack

2

cocaine and cash.   McRae, Jr., was the son of Kelly's boyfriend, Mark McRae, Sr., who was also present at various times.   All of Kelly's guests were smoking marijuana, and some of them had given Jackson money for crack cocaine and were "waiting for their product to come back, but their product never came back." (ECF No. 13, Ex. 4, at 149).   According to Kelly, they were "unhappy" because "[t]hey had customers that were waiting to be served." (*Id.*).

Approximately ten individuals were present when Petitioner arrived at between 7:00 and 8:00 p.m.   Kelly did not know Petitioner, but McRae, Sr., told her he was Jackson's brother-in-law.   Kelly saw Petitioner "walk[] back to the bedroom [where Jackson was located], and then he sat down, and then he got up and he walked back outside.   And then he came back in, and he asked [Jackson] to walk outside with him because he wanted to talk with him." (*Id.* at 132).   Petitioner was at the apartment for "[n]o more than maybe five or ten minutes" when he walked outside with Jackson.   (*Id.*).   At all times while he was inside the apartment, Kelly observed Petitioner as having "one hand in his jacket and the other hand . . . free." (*Id.*).

Shortly after Petitioner and Jackson exited the front door, Kelly walked from a nearby couch and opened the door in order to close an outside "storm door," which had to be "slam[med] . . . in order for it to shut." (*Id.* at 134).   When she did, she

observed Petitioner and Jackson "just standing [alone] . . . in front of the door." (*Id.*). Petitioner had both hands in his jacket pockets. After closing the door, Kelly returned to the couch and, approximately three minutes later, "heard three shots." (*Id.* at 135). Upon opening the door again, she found Jackson "lying on the sidewalk" in a pool of blood (*id.* at 136) and saw a white, four-door sedan "pull away going down the . . . one-way street" (*id.* at 138). She was unable to see the occupants of the vehicle, but observed "two people" inside. (*Id.* at 159). Immediately after the shots were fired, all present at the apartment fled the scene. McRae, Sr., drove Kelly and his two children – McRae, Jr., and eleven-year-old Jermaine Thompson – to a nearby hotel.

Detective Richard McLaughlin of the Laurel Police Department was the lead investigator of Jackson's murder. He testified that, upon his arrival at the crime scene, he observed paramedics unsuccessfully attempting to revive Jackson, who "appeared to [have] a bullet hole in the head and there [were] multiple bullet holes . . . to the upper torso." (*Id.* at 181). Jackson was pronounced dead at the scene.[1]

---

[1] The parties later stipulated to the admission of an autopsy report. According to the prosecutor during closing arguments, the report showed that Jackson was shot five times: "One in the temple, three in the stomach, the midsection, and one in the leg." (ECF No. 13, Ex. 5, at 102).

Lieutenant Robert Mapp was among those assisting Detective McLaughlin in the investigation.   On February 7 – three days after the shooting – he interviewed Kelly at the Laurel police station.   Lieutenant Mapp testified that he recorded the interview, which was approximately forty to forty-five minutes in duration, on a micro-cassette recorder kept in plain view on a table as they spoke in an interview room.   When the interview was complete, he gave the tape to a secretary, who transcribed it and returned the recording and transcript to Lieutenant Mapp. As was his "standard practice" at the time, Lieutenant Mapp reviewed the tape and transcript to ensure that the transcript was accurate.   (ECF No. 13, Ex. 5, at 24).   Upon being shown a transcript of the interview by the prosecutor at trial, Lieutenant Mapp verified that it was a "fair and accurate" representation of what transpired during his interview of Kelly. (*Id*. at 26).   A portion of the interview transcript was admitted into evidence.   (*Id*. at 28).[2]

---

Approximately one month after the shooting, having developed Petitioner as a suspect, Detective McLaughlin showed Kelly a photographic array containing six photographs, including that of Petitioner.   Kelly positively identified Petitioner, as well as two other photographs, as depicting individuals she "recognized."   (ECF No. 13, Ex. 4, at 187).   When she was subsequently recalled by the State, Kelly testified that the photographic array admitted into evidence was not the same one she was shown in 1997.   (ECF No. 13, Ex. 5, at 47-48).

[2] Along with the transcript of Kelly's prior testimony at a related trial in 1997, the interview transcript was a

Following Lieutenant Mapp's testimony, Yvonne Kelly was recalled by the State. Kelly acknowledged that she testified at a related trial in 1997 and that her prior testimony, as reflected in three pages of transcript shown to her by the prosecutor, conflicted in some respects with her initial testimony at Petitioner's trial. She insisted that "[t]here's

significant piece of evidence for the State, as it reflected that, contrary to her initial testimony, Kelly witnessed Petitioner shoot Jackson outside the front door of the apartment. Prior to the second day of trial, the State announced its intention to recall Kelly after entering the transcript into evidence through Lieutenant Mapp. During an extended colloquy outside the presence of the jury, defense counsel objected on numerous grounds, including that it was impossible to authenticate the transcript because the audiotape was missing and that, in any event, the transcript was inadmissible hearsay. The court rejected those arguments, finding that the transcript was admissible as a prior inconsistent statement pursuant to Md. Rule 5-802.1(a):

> The Court finds that the statements, although hearsay, come under an exception to the hearsay rule, again provided that the proper foundation is laid. The Court finds that they are probative in nature, and that if the defense is given an opportunity to cross-examine Ms. Kelly and Detective Mapp regarding those statements or those portions of her statement as previously noted, that due process will be satisfied. And it will again be up to the triers of fact to assess Ms. Kelly's credibility and those statements.

(ECF No. 13, Ex. 5, at 19).

During the same colloquy, the trial judge ruled that the prosecutor could question Kelly about inconsistent testimony she gave during the 1997 trial of another defendant related to the same events.

some things . . . I didn't say that [were] put in [the transcript]" (*id.* at 36-37), but an excerpt of the trial transcript was admitted into evidence.[3]   Kelly further acknowledged giving a statement to police at the Laurel police station shortly after the shooting.   She denied, however, that there was any recording device present at the time of the interview and disputed the accuracy of the interview transcript.[4]

---

[3] During closing argument, the prosecutor read a portion of Kelly's prior testimony to the jury:

> I went to close the storm door to lock the door, but it must have [drawn] their attention or something, and both of them turned around.   And then I [saw] [Petitioner] raise his hand up.   He had his hands in his pockets.   Then I [saw] his hand go up and both of them turned around.   When he shot, when he shot the door, and all I heard was a shot.   And I shut the door and I started screaming and everybody in the house just left.

(*Id.* at 101).

[4] During closing argument, the prosecutor read extensively from Kelly's interview transcript:

> I went to close the storm door.   I went to close – the door must have distracted both of them because he turned, both of them turned around, I just [saw] the guy shoot him . . . and then I just closed the door and went to scream out.   I said somebody is getting shot.   That's when I heard two more shots and everybody in the house started scattering. . . . I [saw] the guy named Architect [*i.e.*, Petitioner's street name]. . . . All I [saw] was his hand go up like that and shot him right there . . . in the

After two days of testimony, the case was submitted to the jury. The following day, the jury returned a verdict finding Petitioner guilty of first-degree murder and use of a handgun. On June 21, 2006, Petitioner was sentenced to life imprisonment, plus a consecutive term of twenty years.[5]

### B.   Appeal

Petitioner noted a timely appeal in the Court of Special Appeals of Maryland, presenting the following questions:

> 1.   Did the circuit court judge who granted the State's motion for continuation comply with § 6-103 of the Criminal Procedure Article of the Maryland Code and Maryland Rule 4-271?
>
> 2.   Did the trial court err in not obtaining a personal waiver from appellant of his right to testify or remain silent?
>
> 3.   Did the trial court err in admitting transcript excerpts of a witness's tape-recorded interview with police?
>
> 4.   Was the evidence sufficient to sustain appellant's convictions?
>
> 5.   Did the prosecutor engage in prosecutorial misconduct?

---

head. . . . He went running to the car. He went running to the white Honda, jumped in and drove off.

(*Id.* at 100-01).

[5]  At sentencing, Petitioner expressed dissatisfaction with his trial counsel's representation insofar as his attorney purportedly "withdrew his objection to Ms. Yvonne Kelly's . . . prior inconsistent statement that was admitted as substantive evidence." (ECF No. 13, Ex. 7, at 5).

6. Did the trial court abuse its discretion by admitting a photographic array that included appellant's mug shot?

(ECF No. 13, Ex. 10, at 2 (footnote omitted)).

On June 3, 2008, the intermediate appellate court issued an unreported decision affirming Petitioner's conviction. As relevant to the instant application, the court rejected Petitioner's argument that the interview transcript was erroneously admitted:

The transcript of Kelly's statements contemporaneously recorded electronically [was] a true and accurate reflection of her statements to Lieutenant Mapp. The recording was transcribed verbatim by a secretary at the police department and then returned to Lieutenant Mapp, who testified that he reviewed the transcript and compared it with the tape-recording to make sure it contained no errors. He concluded that the transcript was a "fair and accurate" reflection of the corresponding electronic version. Consistent with *Nance* [*v. State*, 331 Md. 549 (1993)], the transcript bears sufficient trustworthiness of Kelly's recounting of her personal knowledge of the events in question because it was based on her recorded statement. It is reliable because it is a reflection of Kelly's own words. Kelly was available at trial for appellant to cross-examine her regarding those prior statements. Thus, the transcript of Kelly's taped statement was correctly admitted under Rule 5-802.1(a).

(*Id*. at 21-22).[6]   The court further determined that Petitioner failed to preserve an argument that admission of the prior inconsistent statement violated his rights under the Confrontation Clause of the Sixth Amendment, but nevertheless opined that such an argument "would not have prevailed even if it had been preserved":

> The Confrontation Clause is implicated when the declarant does not testify at trial. *Crawford* [*v. Washington*, 541 U.S. 36 (2004)].   In *Cooley v. State*, 157 Md.App. 101, 108-11 (2004), *rev'd on other grounds*, 385 Md. 165 (2005), former Chief Judge Murphy articulated that prior inconsistent statements by "turncoat witnesses" may be received as substantive evidence under Maryland Rule 5-802.1(a)(3) and *Nance*, *supra*, without violating the Confrontation Clause.   *Accord*, *Adams v. State*, 165 Md.App. 352 (2005).

(*Id*. at 22).

---

[6] Maryland Rule 5-802.1(a) provides:

> The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:
>
> (a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and was signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement[.]

In rejecting Petitioner's challenge to the sufficiency of the evidence, the appellate court explained:

> The jury, as the fact-finder, necessarily reconciled Kelly's earlier statements with her testimony on the witness stand by making a credibility assessment of which version [it] believed was accurate. In Kelly's earlier version, she stated that she saw appellant shoot Jackson before escaping in a white Honda Accord and she identified [Petitioner] from the photo array. Even if the jury rejected Kelly's earlier statements, her testimony on the witness stand was sufficient for the jury to circumstantially find all elements of the crimes for which [Petitioner] was convicted. She testified that the entire time that [Petitioner] was inside of the apartment his hand was inside his jacket pocket, that [Petitioner] and Jackson went outside together approximately three minutes before the shooting and that, when she opened the door, she observed Jackson laying on the ground and there was nobody else in sight. It [was] reasonable for the jury to infer that [Petitioner] was carrying a gun and that he was the culprit. Regardless of which version of events that the jury accept[ed] as true, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found all of the essential elements, beyond a reasonable doubt, to support a conviction.

(*Id.* at 25).

With regard to Petitioner's prosecutorial misconduct challenge related to certain questions posed to Kelly, the court found this claim was unpreserved insofar as a contemporaneous objection was not made by defense counsel. Furthermore, noting that the record reflected that Petitioner was advised of his

right to testify and that, after consultation with counsel, he elected not to do so, the appellate court determined, "the [trial] court properly accepted [Petitioner's] waiver of his right to testify and was not required to further advise [Petitioner] when, evidently, his counsel had already done so." (*Id.* at 17).

Petitioner sought further review in the Court of Appeals of Maryland, which denied his petition for writ of *certiorari* on August 26, 2008. (ECF No. 13, Ex. 12).

**C.   State Postconviction Application**

Petitioner next commenced a collateral attack on his conviction in the Circuit Court for Prince George's County. At a hearing held on October 22, 2009, a circuit court judge addressed approximately sixteen allegations of ineffective assistance of trial counsel, appellate counsel, and prosecutorial misconduct raised by Petitioner in his postconviction application and multiple supplements thereto.

In rejecting Petitioner's allegation that his counsel rendered ineffective assistance by failing to argue that the admission of the interview transcript violated his rights under the Confrontation Clause, the judge explained:

> I can't find that your Sixth Amendment right
> to confront witnesses is violated with
> respect to Ms. Kelly because even though
> that statement may have been made outside of
> your presence, she was at trial. She

12

> testified; [you] certainly had a right to
> confront her; I believe [c]ounsel did; so, I
> don't see how you can maintain that you have
> an argument or legal basis based on a
> violation of the [C]onfrontation [C]lause
> because she was at trial, and the fact that
> she . . . had no one present when she gave
> the statement to the [p]olice, you are not
> entitled to have someone present when
> someone gives a statement to the [p]olice.
> The right to confront her [is] in the trial
> proceeding, and you had that.

(ECF No. 13, Ex. 16, at 100).   Regarding counsel's alleged
failure to object to the admission of the same evidence on other
grounds, the postconviction court noted that defense counsel
argued strenuously at trial that the transcript was
inadmissible:

> There was a discussion about it before the
> [trial] [j]udge as to whether it was a
> reliable transcription of the recorded
> statement. [Counsel] said the tape was not
> available, and the [t]rial [j]udge was
> satisfied that the transcript was
> sufficiently reliable in the form that it
> exists, and therefore, it was admitted
> without signature, which is really what you
> are getting at. And to that end, it doesn't
> matter whether the transcript was certified
> or not.  It was found to be substantially
> credible by [the trial judge] and,
> therefore, admitted, and the Court of
> Special Appeals didn't find that as error.
> And this [c]ourt doesn't find any error by
> [trial counsel] in the way he handled the
> matter.

(*Id*. at 110-11).

    In addressing Petitioner's allegations that his trial
counsel failed to object to certain comments made by the

prosecutor during his closing argument and certain questions posed by the prosecutor to Kelly, the court ruled:

> I fail[] to see from the evidence what misconduct the prosecution committed. Certainly, in closing argument you argue the facts. You bring out inconsistencies, and you suggest[] inferences. Those are all permitted, and as [counsel] testified [at the postconviction hearing], there is a broad latitude to [c]ounsel in terms of how they argue[] the inconsistencies of the evidence. You may not agree with it, Mr. Johnson, and that's fine, but they are permitted to argue these things because the [j]ury determines the facts, and they can draw inferences from the facts.
>
> . . . .
>
> The other issue was that Ms. Kelly had testified that she was afraid of no one . . . or nobody at trial, and you indicated that there was no evidence that you had ever made Ms. Kelly afraid. You felt it was inappropriate for the [p]rosecutor to suggest that. I fail to see where there is some shortcoming on [defense counsel's] part in not objecting to the statements made by the [p]rosecutor.

(*Id.* at 118-19).

Petitioner sought review of the postconviction court's denial of his postconviction application in the Court of Special Appeals. His petition for leave to appeal was denied on July 7, 2010. (ECF No. 13, Ex. 19).

D.   **Federal *Habeas Corpus* Petition**

In this court, Petitioner timely filed an application for *habeas corpus* relief, pursuant to 28 U.S.C. § 2254, raising the following grounds:

> 1.   That his trial counsel rendered ineffective assistance of counsel by:
>
> > a. Failing to object to the admission of the Kelly interview transcript on the ground that it violated his right to confront witnesses against him;
> >
> > b. Failing to file a motion to compel the State to produce the audiotape of Kelly's statement; and
> >
> > c. Failing to object to the admission of the interview transcript because it was not authenticated and certified as a true copy of the audiotape;
>
> 2.   That the prosecutor committed misconduct, in violation of Petitioner's rights under the Fourteenth Amendment, by arguing facts unsupported by the evidence, misstating the evidence, and misleading the jury;
>
> 3.   That his conviction was based on unsworn testimony in the form of Kelly's prior inconsistent statement;
>
> 4.   That the trial court erred by failing to obtain a personal waiver from Petitioner of his right to testify; and
>
> 5.   That the state postconviction court's ruling was an unreasonable determination of the evidence presented.

(ECF No. 1-1, at 6-7).[7]

## II.  Standard of Review

An application for a writ of *habeas corpus* may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Section 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997); *see also Bell v. Cone*, 543 U.S. 447, 455 (2005) (quoting *Lindh*).  This standard is "difficult to meet" and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, --- U.S. ----, ----, 131 S.Ct. 1388, 1398 (2011) (quoting *Harrington v. Richter*, --- U.S. ----, ----, 131 S.Ct. 770, 786 (2011); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)).

A federal court may not grant a writ of *habeas corpus* unless the state's adjudication on the merits: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state adjudication is contrary to clearly established federal law, within the meaning

---

[7]  Petitioner also alleged a speedy trial violation, but later withdrew the claim, acknowledging that it was procedurally defaulted.  (ECF No. 15, at 17).

of § 2254(d)(1), when the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  Under the "unreasonable application" analysis, a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 778 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 785 (internal marks omitted; emphasis removed).

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, ----, 130 S.Ct. 841, 849 (2010). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)).  A federal *habeas* court "may not issue the writ simply because [it] concludes in its independent judgment that

the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, --- U.S. ----, ----, 130 S.Ct. 1855, 1862 (2010) (quoting *Williams*, 529 U.S. at 411) (internal marks omitted). "Rather, that application must be 'objectively unreasonable.'" *Id.* (quoting *Williams*, 529 U.S. at 409).

The federal *habeas corpus* statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.* at 379 (quoting *Wilson v. Ozmint*, 352 F.3d 847, 858 (4th Cir. 2003)).

**III. Analysis**

    **A.   Ineffective Assistance of Counsel**

To succeed on an ineffective assistance of counsel claim, a petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced his

18

defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A strong presumption of adequate representation attaches to counsel's conduct – so strong, in fact, that a petitioner alleging ineffective assistance must show that the proceeding was rendered fundamentally unfair as a result of counsel's omissions or errors. *Id*. at 696. "[A] state court conclusion that counsel rendered effective assistance of counsel is not a finding of fact binding on the federal court to the extent stated by [former] 18 U.S.C. § 2254(d) [now § 2254(e)(1)]." *Id*. at 698. Rather, "state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254[(e)(1)], . . . [and] both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id*. It follows, then, that § 2254(d)(1) applies to the state postconviction court's conclusion that Petitioner's trial counsel did not render ineffective assistance, and this court may not grant relief as long as the state court denied the claims based on a reasonable application of the *Strickland* standard to the facts presented at the postconviction proceeding.

19

Petitioner contends that his trial counsel's performance was constitutionally deficient due to his failure to object on proper grounds to the admission into evidence of a portion of the transcript prepared from the tape-recorded interview Kelly gave to police three days after the murder.   Specifically, he faults his counsel for failing to argue (1) that the transcript "was inadmissible under the [C]onfrontation [C]lause of the Sixth Amendment" (ECF No. 1-1, at 11); (2) that "the alleged out-of-court declaration Kelly made to the police was not admissible under Md. Rule 5-802.1(a)(3)" (*id.* at 16); and (3) that the transcript was not properly authenticated without admission of the audiotape and in the absence of any signature or certification.

In support of his Confrontation Clause argument, Petitioner relies principally on *California v. Green*, 399 U.S. 149 (1970). *Green* involved a witness, Porter, who gave one version of the relevant events during an interview with a police officer, Officer Wade; another version during his testimony at a preliminary hearing; and, at trial, claimed to have no recollection of certain events.   The prosecutor was permitted to refresh Porter's recollection with his prior inconsistent testimony at the preliminary hearing and to call Officer Wade as a witness to testify regarding what Porter had told him during the interview.   On appeal, Green argued that the admission of

both categories of evidence – Porter's prior testimony and his out-of-court statement to Officer Wade – violated his rights under the Confrontation Clause.

The Supreme Court disagreed. Regarding the prior testimony, the Court unequivocally held that "nothing in the Confrontation Clause prohibited the State from . . . relying on [Porter's] prior testimony [at the preliminary hearing] to prove its case against Green." *Green*, 399 U.S. at 168. As to the out-of-court statement, the Court explained:

> [T]he Confrontation Clause does not require excluding from evidence the prior statements of a witness who concedes making the statements, and who may be asked to defend or otherwise explain the inconsistency between his prior and his present version of the events in question, thus opening himself to full cross-examination at trial as to both stories.

*Id*. at 164. Nevertheless, the Court remanded the case for consideration of a "narrow question . . . concerning the admissibility of Porter's statements to Officer Wade":

> In the typical case to which the California court addressed itself, the witness at trial gives a version of the ultimate events different from that given on a prior occasion. In such a case, . . . we find little reason to distinguish among prior inconsistent statements on the basis of the circumstances under which the prior statements were given. . . . Here, however, Porter claimed at trial that he could not remember the events that occurred after respondent telephoned him and hence failed to give any current version of the more

important events described in his earlier
statement.

Whether Porter's apparent lapse of
memory so affected Green's right to cross-
examine as to make a critical difference in
the application of the Confrontation Clause
in this case is an issue which is not ripe
for decision at this juncture.  The state
court did not focus on this precise
question, which was irrelevant given its
broader and erroneous premise that an out-
of-court statement of a witness is
inadmissible as substantive evidence,
whatever the nature of the opportunity to
cross-examine at trial.  Nor has either
party addressed itself to the question.  Its
resolution depends much upon the unique
facts in this record, and we are reluctant
to proceed without the state court's views
of what the record actually discloses
relevant to this particular issue.  What is
more, since we hold that the admission of
Porter's preliminary hearing testimony is
not barred by the Sixth Amendment despite
his apparent lapse of memory, the reception
into evidence of the Porter statement to
Officer Wade may pose a harmless-error
question which is more appropriately
resolved by the California courts in the
first instance.

*Green*, 399 U.S. at 168-70 (footnote omitted).

Observing that the Court was unable to find that Porter's
out-of-court statement was admissible under the Confrontation
Clause, Petitioner insists that *Green* addressed only the
admissibility of Porter's prior testimony.  He further asserts
that "the out-of-court declaration allegedly made by Kelly to
the police is identical to the out-of-court declaration Porter
made to [O]fficer Wade in [*Green*]."   (ECF No. 1-1, at 15).

Thus, according to Petitioner, "[u]nder *Green*, it is conceivable that [the] out-of-court declaration made to the police is not admissible under the Confrontation Clause because it was not taken under oath and subject to cross-examination." (*Id.*).   He contends that his trial counsel's representation was constitutionally infirm for failing to argue this point.

Petitioner misapprehends the import of *Green*.   At his trial, Kelly did not claim that she had no recollection of the critical events, as Porter did in *Green*.   Rather, she testified that she saw Petitioner, with his hands in his pockets, talking with Jackson on her front porch just before the shooting. Because Kelly previously told Lieutenant Mapp, during the interview, that she saw Petitioner raise his hand and shoot Jackson before running to a car, this was a "typical case" in which "the witness at trial gives a version of the ultimate events different from that given on a prior occasion."   *Green*, 399 U.S. at 168.   In such circumstances – where the witness "concedes making the [prior] statements," as Kelly did here – *Green* makes clear that the witness "may be asked to defend or otherwise explain the inconsistency between [her] prior and [her] present version of the events in question, thus opening himself to full cross-examination at trial as to both sides." *Id*. at 164.   That is precisely what happened at Petitioner's

trial, and *Green* does not mandate an alternative result.[8] Accordingly, Petitioner's trial counsel could not have rendered ineffective assistance in failing to object on the ground of the Confrontation Clause, as the postconviction court properly found.

Petitioner's arguments that his counsel rendered ineffective assistance by failing to exclude the admission of the interview transcript on other grounds – *i.e.*, by moving to compel production of the audiotape, and/or by failing to object that the transcript was not authenticated or certified as a true copy – are also unavailing. Initially, the record reflects that defense counsel made the trial court aware that the audiotape was not available – thus, it would have made little sense to move to compel it – and argued that, in its absence, "there is no real test of the validity or the v[e]racity of the contents of that statement." (ECF No. 13, Ex. 5, at 5). He further argued that there was "insufficient indicia . . . to give credence to the introduction of this electronic statement" because it was not signed or otherwise adopted by the witness.

---

[8] *Crawford v. Washington*, 541 U.S. 36 (2004), another case cited by Petitioner, is not to the contrary. In *Crawford*, 541 U.S. at 68, the Supreme Court held that the admission of "testimonial" hearsay violates the Confrontation Clause where the declarant is unavailable and the defendant had no "prior opportunity for cross-examination." Where, as here, the declarant (*i.e.*, Kelly) is available for cross-examination, the concerns addressed in *Crawford* are not implicated.

(*Id.* at 8; *see also id.* at 13 ("there is nothing that would reflect whether or not it was the declarant's intention to adopt that statement, and there's no way to test it at this point")). Moreover, Petitioner's trial counsel maintained that the statement did not qualify as a prior inconsistent statement under Md. Rule 5-802.1(a) and *Nance*, and attempted to distinguish the case law cited by the prosecutor in support of his argument to the contrary.

Over defense counsel's objections, the trial court found there was sufficient indicia that the transcript of Lieutenant Mapp's interview of Kelly was reliable, noting the officer's testimony that he reviewed the tape and transcript shortly after it was made and his affirmation that the transcript admitted into evidence was a true and accurate reflection of what transpired during the interview. While Kelly later testified that the interview was not recorded and that the transcript was inaccurate, she acknowledged that the interview took place and, implicitly, that the transcript conflicted with her initial trial testimony. Thus, there was a basis for finding that she gave a prior inconsistent statement and that the statement was electronically recorded. While it is true that the recording was not available to authenticate the transcript, the trial court credited Lieutenant Mapp's testimony as to its authenticity and found that the out-of court statement was

admissible pursuant to Md. Rule 5-802.1(a).   Moreover, the Court of Special Appeals considered this issue on appeal and affirmed the trial court's ruling.

This court is not permitted to second-guess a trial court's evidentiary ruling on *habeas corpus* review.   *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"; rather, the court concerns itself only with "deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[f]ederal habeas corpus relief does not lie for errors of state law."); *Sharpe v. Bell*, 593 F.3d 372, 383 (4th Cir. 2010) ("It is beyond the mandate of federal habeas courts . . . to correct the interpretation by state courts of a state's own laws.").   The sole question before the court regarding the admission of Kelly's out-of-court statement is whether Petitioner received the effective assistance of trial counsel, as required by the Sixth Amendment.   The instant record reflects that Petitioner's counsel did raise the arguments that Petitioner now contends he did not, and the fact that those arguments were ultimately unsuccessful is of no real consequence at this stage.   Accordingly, there is no basis for disturbing

the state postconviction court's finding that Petitioner's trial

counsel did not render constitutionally ineffective assistance.[9]

### B.   Prosecutorial Misconduct

Petitioner also takes issue with the conduct of the

prosecutor at his trial.  Specifically, he argues that "the

prosecutor testified without being subject to cross-examination"

in the following ways:

> (1) The prosecutor asked questions which
> implie[d] a factual predicate which he
> kn[ew] he [could not] support by evidence,
> when he asked Ms. Kelly [if she was] scared
> of the Petitioner, (2) The prosecutor
> expressed his personal belief as to [the]
> falsity of Kelly's trial testimony, and
> intentionally argued on the basi[s] of facts
> outside the record, when he argue[d] [during
> his summation] that Kelly [was] testifying
> differently at trial compared to her prior
> statement[s] to the police because she [was]
> scared of the Petitioner, [and] (3) The
> prosecutor intentionally misstated the
> evidence and misled the jury as to the
> inferences it may draw, when he argued that
> the petitioner was the only one outside

---

[9]   Because the court finds that the performance of
Petitioner's trial counsel was not deficient – that is, that
Petitioner cannot satisfy the first prong of *Strickland* – it
does not reach the question of whether Petitioner was prejudiced
as a result of any such deficiency.  It bears mention, however,
that even if some error that allowed the admission of Kelly's
out-of-court statement had been found, the jury was still
presented with the witness's prior testimony, which Petitioner
appears to concede was properly admitted.  While the out-of-
court statement may have provided more detail, its substance was
essentially the same as the prior testimony – *i.e.*, both
statements reflect that Kelly saw Petitioner shoot Jackson.
Thus, it would be unlikely that Petitioner could establish a
Sixth Amendment violation because he could not show sufficient
prejudice stemming from admission of the out-of-court statement.

> before the victim was shot, and that Kelly
> made a mistake with the color of the car
> leaving the scene after the shooting.

(ECF No. 1-1, at 39).[10]   Respondents contend that Petitioner's

claim in this regard is procedurally defaulted.

Where a petitioner has failed to present a claim to the

highest state court with jurisdiction to hear it – whether by

failing to raise the claim in postconviction proceedings or on

direct appeal – the procedural default doctrine applies.   *See*

*Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991) (failure to

note timely appeal); *Murray v. Carrier*, 477 U.S. 478, 489-91

(1986) (failure to raise claim on direct appeal); *Murch v.

Mottram*, 409 U.S. 41, 46 (1972) (failure to raise claim at

postconviction); *Bradley v. Davis*, 551 F.Supp. 479, 481 (D.Md.

1982) (failure to seek leave to appeal denial of postconviction

relief).   A procedural default also may occur where a state

court declines "to consider [the] merits [of a claim] on the

basis of an adequate and independent state procedural rule."

*Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999).

As the Fourth Circuit has explained:

> If a state court clearly and expressly bases
> its dismissal of a habeas petitioner's claim
> on a state procedural rule, and that
> procedural rule provides an independent and
> adequate ground for the dismissal, the
> habeas petitioner has procedurally defaulted

---

[10] Petitioner further argues that the prosecutor's conduct
in this regard was in violation of various ethical rules.

> his federal habeas claim. *See Coleman* [501
> U.S. at 731-32]. A procedural default also
> occurs when a habeas petitioner fails to
> exhaust available state remedies and "the
> court to which the petitioner would be
> required to present his claims in order to
> meet the exhaustion requirement would now
> find the claims procedurally barred." *Id*.
> at 735 n. 1.

*Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).

If a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits, or (2) that failure to consider the claim on the merits would result in a miscarriage of justice, *i.e.*, the conviction of one who is actually innocent. *See Murray*, 477 U.S. at 495-96; *Breard*, 134 F.3d at 620.[11] "Cause" consists of "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim in state court at the appropriate time." *Breard*, 134 F.3d at 620 (quoting *Murray*, 477

---

[11] Habeas petitioners may use an actual innocence claim to excuse the procedural default of a separate constitutional claim upon which they request habeas relief. *See Murray*, 477 U.S. at 496. "[When] a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id.; see also Reid v. True*, 349 F.3d 788, 806 (4th Cir. 2003). Petitioners who wish to use a claim of actual innocence as a gateway to raising an otherwise defaulted constitutional claim must demonstrate by a preponderance of the evidence that a reasonable juror could not have convicted the petitioner in light of the new evidence. *See Buckner v. Polk*, 453 F.3d 195, 199-200 (4th Cir. 2006).

U.S. at 488).   Even where a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice.   *See Schlup v. Delo*, 513 U.S. 298, 314 (1995).

On direct appeal, Petitioner faulted the prosecutor for his questioning of Ms. Kelly.   Specifically, he argued:

> [T]he State asked Kelly whether she was, "Scared of the defendant?"   The witness answered, "No.   I'm just scared period." (T. 6/13/03 at 167).   After Kelly was recalled by the State the following day, she was again asked by the prosecutor, "Are you scared of the defendant?"   Kelly replied, "No, I'm not scared of nobody." (T. 6/14/06 at 49).   Such questioning was tantamount to the prosecutor testifying without being subject to cross-examination by the defense, in violation of Appellant's confrontation and cross-examination rights under the Sixth Amendment.

(ECF No. 13, Ex. 8, at 32).   Finding that "[d]efense counsel objected the first time that the question was asked, but not the second time," the Court of Special Appeals determined that "the issue was not preserved" for its review.   (ECF No. 13, Ex. 10, at 26-27).   In his petition for a writ of *certiorari*, Petitioner asked the Court of Appeals to review whether the intermediate appellate court "err[ed] by not reviewing the prosecutorial misconduct issue as plain error." (ECF No. 13, Ex. 11, at 2).

Before the state postconviction court, Petitioner filed numerous, lengthy motion papers.  At the outset of the postconviction hearing, the court sought to identify all of the issues pending before it.  With respect to the issue of prosecutorial misconduct, the following exchange ensued:

> THE COURT: The eighth ground is that Trial Counsel failed to object to the Prosecutor's improper questions and arguments?  Is that it?
>
> [PETITIONER]: No, that's not everything, Your Honor.
>
> Failed to object to the improper argument and questions because the Prosecutor stated that Ms. Kelly was afraid.
>
> There was no evidence on the record that either me or anybody threatened her or did anything to make her afraid.
>
> [THE COURT]: He didn't object?
>
> [PETITIONER]: Right, [the prosecutor was] arguing stuff that [was] not [i]n the record.

(ECF No. 13, Ex. 16, at 7).  At the conclusion of the preliminary identification of issues to be addressed, the court inquired as to whether it had identified all of Petitioner's issues:

> THE COURT: Is there something that I missed that you can refer me to in your supplement?
>
> [PETITIONER]: Prosecutorial misconduct was also raised on plain error.

> THE COURT: That is what you are saying. [Is there] [s]omething in your supplement to the Petition that I left out?
>
> [PETITIONER]: Yes, you didn't say the prosecutorial misconduct.
>
> THE COURT: So, that's it?
>
> [PETITIONER]: That's it, and the confrontation clause violation.
>
> THE COURT: Are there any scenarios, factual scenarios[,] that you are referring to in support of what you are saying?
>
> [PETITIONER]: Same grounds, Your Honor.
>
> THE COURT: All the stuff I just said? That's what I'm trying to get at.
>
> [PETITIONER]: Sorry, Your Honor.
>
> THE COURT: Anything different, factually different that you are complaining of?
>
> [PETITIONER]: No, Ma'am.

(*Id.* at 10-11).   As noted, the postconviction court addressed Petitioner's claims and found no objectionable conduct on the part of the prosecutor, thereby rejecting Petitioner's claim that his counsel rendered ineffective assistance by failing to object.  (ECF No. 13, Ex. 16, at 118-19).

Thus, Petitioner argued on direct appeal that the prosecutor's improper questioning of Kelly amounted to prosecutorial misconduct.  Before the postconviction court, he claimed that his trial counsel rendered ineffective assistance

32

for failing to object to remarks made by the prosecutor during closing arguments. The argument he now raises – *i.e.*, that the prosecutor committed misconduct in both his questioning of Kelly and in making certain comments during his closing argument – consists partially of the question he raised in the appellate court (regarding the questioning of Kelly) and partially of a question not directly presented to any state court (comments during closing argument). The aspect of Petitioner's claim regarding the questioning of Kelly has been procedurally defaulted by virtue of the intermediate appellate court's finding that it was unpreserved. *See Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977) (the "failure to timely object . . . amount[s] to an independent and adequate state procedural ground which . . . prevented [habeas] review"). Moreover, Petitioner's argument in the postconviction court – *i.e.*, ineffective assistance for failing to object during closing arguments – is not the same as the one he now raises – *i.e.*, that the prosecutor's misconduct in closing violated his constitutional rights. Thus, this claim is unexhausted, *see Joseph v. Angelone*, 184 F.3d 320, 328 (4th Cir. 1999) ("In order to avoid procedural default [of a claim], the substance of [the] claim must have been fairly presented in state court"), and, if he has any means of doing so, Petitioner is required to return to state court to raise it, *see Rose v. Lundy*, 455 U.S. 509, 515 (1982)

33

("federal courts should not consider a claim in a habeas corpus petition until after the state courts have had an opportunity to act"). Nevertheless, where, as here, a petitioner would be precluded from returning to state court and raising the claim, he has procedurally bypassed the opportunity for relief and a federal habeas court is barred from considering the claim, absent a showing of cause and actual prejudice. *See Breard*, 134 F.3d at 619. "In such an instance, the exhaustion requirement is 'technically met' and the rules of procedural bar apply." *Whitt v. McCall*, Civ. No. 3:09-998-CMC-JRM, 2010 WL 1027626, at *5 (D.S.C. Feb. 22, 2010) (quoting *Matthews v. Evatt*, 105 F.3d 907 (4th Cir. 1997)); *see also Coleman*, 501 U.S. at 735 n. 1; *Teague v. Lane*, 489 U.S. 288, 297-98 (1989); *George v. Angelone*, 100 F.3d 353, 363 (4th Cir. 1996)).

Having determined that Petitioner's prosecutorial misconduct claim is procedurally defaulted, Petitioner must show cause for his failure to raise the claim in state court and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the claim is not addressed. *See Murray*, 477 U.S. at 486 ("the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default"). Petitioner has

not made the requisite showing, nor could he under the facts of this case.

It is unquestionably true that "[a] fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Likewise, it is axiomatic that prosecutors are held to a high standard of fairness. A prosecuting attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). In order to establish prejudicial misconduct, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also United States v. Caro*, 597 F.3d 608, 624 (4th Cir. 2010). In order to prevail on a claim of prosecutorial misconduct, a petitioner "must show (1) 'that the prosecutor's remarks or conduct were improper' and (2) 'that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial.'" *Caro*, 597 F.3d at 624-25 (quoting *United States v. Scheetz*, 293 F.3d 175, 185 (4th Cir. 2002)).

Petitioner's primary contention is that the prosecutor inappropriately argued during his summation that, despite her assertions to the contrary, Kelly was afraid of Petitioner and this was the reason for her inconsistent testimony. As the state postconviction court explained, the prosecutor was entitled, during his closing argument, to highlight factual inconsistencies and suggest inferences that the jury could draw. Consistent with that function, the prosecutor acknowledged that Kelly denied being afraid, but argued that her demeanor suggested otherwise. The postconviction court found that this characterization of the evidence was permissible because "the [j]ury determines the facts, and [it] can draw inferences from the facts." (ECF No. 13, Ex. 16, at 118). The court further determined that there was nothing inherently objectionable about the prosecutor asking Kelly if she was afraid, particularly in light of her inconsistent statement to police and her testimony at a prior trial. Moreover, the court explained that the prosecutor was entitled to argue that Kelly erroneously believed that the car she saw leaving the scene was white when, in fact, it was gold in color, and that he did not misstate the evidence when he argued that Petitioner was alone with Jackson on the front porch at the time of the shooting.

In sum, the analysis of the postconviction court makes clear that Petitioner's claim does not warrant a waiver of the

36

procedural default doctrine. Accordingly, the merits of Petitioner's prosecutorial misconduct claim will not be reached.

### C.   Sufficiency of the Evidence

Petitioner further contends that the only evidence supporting his conviction was the "unsworn prior inconsistent statement allegedly made by Kelly to the police," which he characterizes as "the only testimony that stated that Yvonne Kelly saw [him] shoot the victim." (ECF No. 1, at 44). While he acknowledges that this claim was raised on direct appeal, he asserts that the Court of Special Appeals did not address it on the merits. To the extent that this claim focuses on the admissibility of Kelly's out-of-court statement, it has been addressed herein. Insofar as the claim challenges the sufficiency of the evidence, it was addressed on the merits by the appellate court.

In considering a challenge to the sufficiency of the evidence on federal *habeas corpus* review, the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The court must consider both circumstantial and direct evidence and allow the government the benefit of all reasonable inferences from the evidence adduced at trial. *See United States v. Tresvant*, 677

F.2d 1018, 1021 (4th Cir. 1982).   More importantly, in the context of this case, the determination of the credibility of each witness lies within the sole province of the jury and is not subject to review.  *See United States v. Saunders*, 886 F.2d 56, 60 (4th Cir. 1989); *Pigford v. United States*, 518 F.2d 831, 836 (4th Cir. 1975).

In considering Petitioner's appeal, the Court of Special Appeals applied a similar standard when it observed that it was not the role of the appellate court to re-weigh the evidence. It noted that the only concern was whether there was sufficient evidence to show – directly, circumstantially, or by rational inference – that Petitioner was guilty of the offenses charged beyond a reasonable doubt.  The appellate court determined that the evidence adduced at trial satisfied this standard: "Even if the jury rejected Kelly's earlier statements, her testimony on the witness stand was sufficient for the jury to circumstantially find all elements of the crimes for which appellant was convicted."  (ECF No. 13, Ex. 10, at 25). Specifically, her testimony established that Petitioner kept one hand in his jacket pocket at all times while he was inside the apartment; that Petitioner and Jackson were talking alone on the front porch just before the shooting; and that, after the shooting, she saw Jackson lying on the ground and no one else present.  Thus, the Court of Special Appeals explained, it was

reasonable for the jury to infer that Petitioner had a gun and shot the victim.   The reasoning of the appellate court is unassailable.   The evidence supporting Petitioner's conviction was constitutionally sufficient.

####    D.    Personal Waiver of the Right to Testify

Petitioner's claim that the trial court erred when it did not obtain a personal waiver from him regarding his right to testify or remain silent was also addressed by the Court of Special Appeals.   The intermediate appellate court observed that Petitioner's reliance on *Tilghman v. State*, 117 Md.App. 542 (1997), as requiring the trial court to question the defendant in person regarding a waiver of the right to testify, was misplaced.   The court explained that *Tilghman* addresses a self-represented defendant's waiver of the right to testify and requires that court to advise the defendant of his or her constitutional right to testify under those circumstances.   A trial court does not have the same obligation when the defendant is represented by counsel, however, because it is reasonable to infer that attorneys have explained those rights adequately. The appellate court concluded that, at Petitioner's trial, counsel informed the court that he advised Petitioner of his right to testify and that Petitioner waived that right.   (ECF No. 13, Ex. 10, at 15-16).

For purposes of federal *habeas corpus* relief, Petitioner's claim that an independent waiver colloquy was required in order for his waiver to be effective does not state a claim for relief. The United States Court of Appeals for the Fourth Circuit has observed that "this court and the majority of our sister circuits have clearly held that '[t]o waive the right [to testify], all the defendant needs to know is that a right to testify exists,' and the [trial] court need not advise the defendant of the right nor obtain a waiver." *United States v. Sharp*, 400 Fed.Appx. 741, 749 (4th Cir. 2010) (quoting *United States v. McMeans*, 927 F.2d 162, 163 (4th Cir. 1991)); *see also Sexton v. French*, 163 F.3d 874, 882 (4th Cir. 1998) ("trial counsel, not the court, has the primary responsibility for advising the defendant of his right to testify"; thus, "the burden of ensuring that a criminal defendant is informed of the nature and existence of the right to testify rests upon trial counsel"). Accordingly, Petitioner's claim regarding personal waiver of the right to testify does not present a basis for *habeas corpus* relief.

### E.   Unreasonable Determination of Facts

Petitioner further asserts, as an alternative ground for relief, that the state postconviction court's conclusion that there were no meritorious grounds warranting postconviction relief was erroneous because it failed to account for "the

multitude of evidence presented to the [s]tate court" in his postconviction application. (ECF No. 1-1, at 49-50). His claim in this regard is belied by the postconviction hearing transcript, which clearly reflects that the state court went to great lengths to ensure that all claims raised by Petitioner in numerous postconviction submissions were considered. In rendering its oral decision at the conclusion of the hearing, the court addressed each of Petitioner's claims and explained, in detail, why relief could not be granted. There is no basis for a finding that this decision was unreasonable, and Petitioner's claim to the contrary is without merit.

## IV. Conclusion

For the foregoing reasons, Petitioner's application for a writ of *habeas corpus* will be denied. The court is further required to consider whether the issuance of a certificate of appealability is warranted. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327

(2003).    Because   this   court   finds   that   there   has   been   no substantial  showing  of  the  denial  of  a  constitutional  right,  a certificate  of  appealability  will  not  issue.    *See*  28  U.S.C.  § 2253(c)(2).

A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge